DRAKE *et al.*, *Trustees*, v. CRANE *et al.*, *Appellants*.

### Division Two, March 5, 1895.

1. **Will, Construction of:** EQUITY. While a court of equity can construe a will and determine the powers of the trustees thereunder, it can not make a new will for the testator.

2. ———: TECHNICAL WORDS. Technical words when used in a will are to be interpreted according to their fixed legal sense and as the testator is presumed to have used them, unless a contrary meaning is plainly indicated by the context of the will.

3. ———: ———. The meaning of the terms "invest" and "reinvest" discussed.

4. **Will:** TRUSTEES. Where trustees are empowered to invest and reinvest the funds of an estate, a duty is imposed upon them to so place the money that it shall be safe and productive.

Drake v. Crane.

5. **Will, Construction of:** POWERS OF TRUSTEES. A testator set apart a reserve fund to be retained by trustees to guard against losses by shrinkage in the value of his real estate or by other contingencies and to be invested and reinvested from time to time until the termination of the trust. *Held*, that a donation to a corporation proposing to erect an hotel in the neighborhood of the estate was within the power, it appearing that such structure would prevent decrease in the values of testator's real estate and increase its revenues.

6. ———: ———: RES ADJUDICATA. A plea of *res judicata held* not well taken in this case.

*Appeal from St. Louis City Circuit Court.*—HON. D. D. FISHER, Judge.

AFFIRMED.

*Everett W. Pattison* and *John F. Green* for appellants.

(1) The power of the court, sitting as a court of equity, is to construe the will, not to make a new will. *Marshall v. Hadley*, 50 N. J. Eq. 547; *Academy v. Adams*, 65 N. H. 225; 1 Perry on Trusts, sec. 460. (2) A court of equity can no more authorize an act to be done which is in excess of the powers conferred by the will than can the trustees do such act. *Society v. Academy*, 94 Mo. 459; *Ex parte Adamson*, L. R. 8 Ch. Div. 817; *Traphagen v. Levy*, 45 N. J. Eq. 451; *Griggs v. Veghte*, 47 N. J. Eq. 181; *Marshall v. Hadley*, 50 N. J. Eq. 547; *Mullany v. Mullany*, 3 Green's Ch. 16; *Richardson v. Knight*, 69 Mo. 288; *Trust Co. v. Glover*, 90 Ky. 355. (3) The words "invest," "reinvest" and "manage," as used in the will, and in the former decree of the circuit court, are words of ordinary import, and the testator will be presumed to have used them in their ordinary sense, a contrary intention being nowhere indicated in the will. *Kean v. Hoffecker*, 2 Harrington, 103; *Sims v. Conger*, 39

Drake v. Crane.

Miss. 231; *Commissioners v. Walker*, 6 How. (Miss.) 143. (4) The construction of the clauses in question have already been determined by the circuit court in its decree made in 1888, and the matter has become *res adjudicata*. (5) The words "invest" and "reinvest" *ex vi termini* import a placing of funds where the principal will be safe and will produce an income. *Neel v. Beach*, 92 Pa. St. 226; *Una v. Dodd*, 39 N. J. Eq. 186; *People v. Ins. Co.*, 15 Johns. 392; *People v. Commissioners*, 23 N. Y. 244; Black's Law Dictionary, 567. (6) The uniform construction which has been placed upon like provisions in a will, is that they impose upon trustees the duty to so place the funds of the estate that they shall be, *first*, safe, and, *second*, productive. *Kimball v. Reding*, 31 N. H. 352; *Dickinson's Appeal*, 152 Mass. 185; *Mason v. Bank*, 16 Mo. App. 275; *Powell v. Hurt*, 108 Mo. 520; *Haydel v. Hurck*, 72 Mo. 253; *Davis v. Railroad*, 131 Mass. 258; *Peckham v. Newton*, 15 R. I. 321; *Budge v. Gummow*, L. R. 7 Ch. App. 719; *Tomkinson v. Railroad*, L. R. 35 Ch. Div. 675; 1 Perry on Trusts, secs. 452, 456, 459. (7) The discretion vested in the trustees is not an unlimited discretion. They are bound to exercise such care, skill and diligence as reasonably prudent persons give to their own affairs when seeking to reach similar results. *Powell v. Hurt*, 108 Mo. 507. (8) The words, "As I might lawfully do if living," do not confer any additional power, nor extend the powers expressly granted. *Price v. Courtney*, 87 Mo. 387.

*Boyle & Adams* and *S. N. & J. G. Holliday* for respondents.

(1) The cardinal rule in the interpretation of wills is, to discover, from a consideration of all the language of the will, taken from its four corners and from a

consideration of the circumstances surrounding the
testator at the time of making the will, his real inten-
tion. *Noe v. Kern*, 93 Mo. 367; *Long v. Timms*, 107
Mo. 512; *Schorr v. Carter*, 120 Mo. 413; *Cassidy v.
Hynton*, 44 Ohio St. 530. A general view of powers
conferred in Mr. Allen's will is sufficient to authorize the
trustees to make the subscription in question. Black's
Law Dic., p. 747; *Readington v. Co.*, 19 Hun, 408;
*Watson v. Cleveland*, 21 Conn. 538; 2 Perry on Trusts
[4 Ed.], sec. 476. (2) An analysis of the language of
items 1, 2 and 3, of clause seventh of Mr. Allen's will,
shows that the trustees' powers of management were
not limited "to investing and reinvesting" proceeds of
sale, but are sufficient to authorize making the subscrip-
tion in question. (3) An analysis of the power in
relation to the "reserve fund" found in Mr. Allen's
will, shows ample authority for the trustees to make
the subscription in question. The trustees could do,
under the circumstances which surrounded them in
February, 1892, what ordinarily prudent persons could
do. *Powell v. Hurt*, 108 Mo. 507; *In re Weston*, 91 N.
Y. 502; *King v. Talbot*, 40 N. Y. 76. (4) In inter-
preting a will such meaning must be given, if possible,
as will give due weight to all its parts and make the
whole consistent. *Shickle v. Chouteau*, 84 Mo. 161.
(5) The subscription desired to be made by the trus-
tees in this case was not a gift, but was the wisest invest-
ment which could have been made at the time, and
was justified in the emergency. Perry on Trusts,
*supra*, sec. 476; *Baker v. Disbrow*, 3 Redf. 348; *Ward
Kitchen*, 30 N. J. Eq. 31; *Lovell v. Minot*, 20 Pick.
116; *In re Weston, supra*. (6) Appellants' plea of
*res adjudicata* can not be sustained.

BURGESS, J.—This is a suit instituted by the plain-
tiffs, trustees under the will of Gerard B. Allen,

deceased, against all the parties interested therein, to obtain a construction of said will. The will devised all the testator's real property to the trustees named in the will, with certain powers therein mentioned. Among other powers given the trustees by the will were the following:

"To enter into the possession thereof, immediately after my death, collect the rents, with full power, subject to the limitations hereinafter imposed, to sell, lease, manage and dispose of the same, and to invest and reinvest the proceeds of the sale thereof, and to do all and singular with respect to said real estate and the management thereof, and the investing and reinvesting of the proceeds of sales thereof, as I might lawfully do if living.

"2. My said trustees shall have no power to sell the real estate to me belonging, which is situated in the limits bounded by Walnut street on the south, Ashley street on the north, as far west as Ashley street extends, and then Biddle street on the north, Twelfth street on the west, and the Mississippi river on the east.

"All the real estate in the second item of the seventh clause of my will being in the city of St. Louis and state of Missouri.

"3. All my real estate, wherever situated, and not herein disposed of otherwise, except mentioned in the last preceding item (item 2 of seventh clause), I give my said trustees full power to sell, lease, incumber or improve."

Then, after providing for the payment of certain annuities out of such rents, he directs as follows:

"This trust shall cease on the happening of the three following events, to wit: *First*, the death of the last surviving life annuitant mentioned herein; *second*, the death of the last survivor of my three children, Mary Frances Crane, George L. Allen, and Grace

Dickson; and, *third*, the death of the last survivor of my grandchildren living at the time of my death, by my said three children, Mary F. Crane, George L. Allen, and Grace Dickson.

"During the existence of this trust, from the time of my death until its termination by the happening of the three events as above provided, the net rents, issues and profits arising from this trust estate, after paying taxes, insurance, for repairs and improvements, and the life annuities above mentioned, shall be annually divided into two portions, one of which shall consist of twenty-five per cent., as near as may be, of said net rents, to be called a reserve fund, and the other shall consist of the remaining seventy-five per cent. of said net rents, to be called the surplus fund. The said reserve fund my said trustees shall retain to guard against losses by shrinkage, or other contingencies, and they shall invest and reinvest the same from time to time, until the termination of this trust, and out of said reserve fund they may, if their judgment so approve, make advances from time to time to any one or more of the male descendants of my said three children, Mary F. Crane, George L. Allen, and Grace Dickson, after said male descendants shall have arrived at the age of twenty-five years and given satisfactory evidence of industry, general morality, business habits, and ability to enable them to embark in business. And in like manner, should any of the female descendants of my said three children marry, then said trustees may make reasonable advances to said females so marrying to enable their husbands, if they have given satisfactory evidence of industry, general morality, businesslike habits and ability, to embark in business, or place the same in trust for the sole use and benefit of said female descendant so marrying. The amount, however, of advances thus made to any one person, for such pur-

pose, shall not exceed twenty thousand dollars. All such advances shall be regularly charged against the beneficiary, and equalized in the general settlement at the termination of this trust. From the time of my death until the termination of this trust as hereinbefore provided, I give and bequeath the surplus fund above specified, being seventy-five per cent. of the net rents, issues and profits arising from this trust estate, to my three children, Mary Frances Crane, George L. Allen, and Grace Dickson, share and share alike, during their natural lives respectively."

Then, after making provisions in case of death of said beneficiaries, he directs as follows:

"On the termination of this trust, at the happening of the three events as hereinbefore provided, all the real estate held in this trust and reserve fund, if any, on hand after equalizing the advances made therefrom, shall be divided, share and share alike, *per stirpes*, between the descendants of my said three children, Mary F. Crane, George L. Allen, and Grace Dickson, and if there be no descendants of either of my said three children then living, then the said real estate and reserve fund shall be divided equally, share and share alike, *per stirpes*, among the descendants of such of my said three children as have descendants then living."

A part of the estate vested in the trustees is denominated by the will as a "reserve fund," and it is with respect to this fund that this controversy arose.

In 1888 the trustees filed a similar bill to obtain the same object, that is, a proper construction of the seventh clause of the will. In that case the court did construe the clause in question, and declared the powers of the trustees thereunder.

At the time of the execution of the will the testator was the owner of a large amount of real estate, situate in the city of St. Louis, a large portion of which

was situated in close proximity to the site of the old Planters House, on Fourth street between Chestnut and Pine streets.

In 1892 a corporation by the name of the Commonwealth Realty Company had determined to construct somewhere in said city a large hotel to cost at least a million dollars. There was much rivalry among the property owners in different localities to secure the location of this hotel, and to this end, they offered the company which was proposing to build it sums of money of various amounts to induce the company to erect the hotel in their respective localities. The site of the old Planters House was one of the points the company had in consideration, but were unwilling to erect the hotel there, unless the property owners on Fourth street would subscribe a sufficient amount. That sum was fixed at $200,000, which was at the rate of $100 a front foot for the property on Fourth street between Washington avenue and Market street. The hotel company had already received from the Fall Festivities Association a bonus of $100,000.

Of the real estate held by the trustees under the will, some of that which is on Fourth street is directly opposite the old Planters House. The trustees were requested to donate from the reserve fund $100 a front foot for all the trust property on Fourth street, aggregating about two hundred and twenty-five feet. Doubting their power under the will to do so, they declined, but decided to apply to the court for instructions.

Two of the trustees, Allen and Holliday (the other one being absent from the city) were then consulted, and, as a result of the conference with them, a paper was drawn up in which George Allen personally subscribed toward the hotel fund the sum of $5,600 on condition that if the court should construe the will as conferring power in the trustees to make the donation

he, Allen, should be released from his individual subscription. The other adult life tenants did not subscribe. In the same paper Allen and Holliday agreed to at once institute a suit to obtain a construction of the will, and if it should be held that the trustees had the power under the will to make the donation out of the reserve fund, that they would at once do so and pay the sum subscribed.

The subscription paper begins as follows: "Subscription to the Commonwealth Realty Company as bonus or donation towards the building of hotel." It contains the following language: "That they (the subscribers) will each, respectively, pay unto the said Commonwealth Realty Company, as contributions and donations to aid in the erection of said hotel building, the several sums subscribed for below and set opposite their respective names."

The Hotel Company accepted the subscription of George L. Allen and the promise of himself and his cotrustees to institute this suit, and proceeded at once to select and purchase the site of the old Planters House, and with the erection of the hotel building.

After the site had been selected, the trustees instituted this action, and in their petition set out substantially the foregoing facts. The bill alleges that the frontage of property belonging to the Allen estate on Fourth street is two hundred and twenty-five feet. The petition further alleges that it is the belief of the trustees that the building of a hotel, such as contemplated, on the Planters House site, would largely increase the real value and the rental value of the property on Third and Fourth streets belonging to the trust estate, and would be a potent factor in preventing any further shrinkage in said real estate; and aver that they "know of no other way of investing that amount of the reserve fund that would have so favorable an effect in

keeping up and enhancing the rental and permanent value of said estate." The prayer of the bill is that the trustees have authority to subscribe $22,400, payable out of the reserve fund.

The answers of the infant defendants denied any knowledge or information sufficient to form a belief as to the truth of the allegations contained in the bill, and prayed that their rights be protected. They also set up the former decree as a full adjudication of the matter.

The court held that the will gave the trustees the power to make the donation, and directed that they pay the Commonwealth Realty Company out of the reserve fund the sum of $22,400. Judgment by default was rendered against the life tenants, from which they did not appeal.

The infant defendants who alone made defense are the grandchildren of the testator, some of whom were living at the time of his death; others have been born since that time. Those born since the testator's death are Allen R. L. Crane, Kennith Dickson and Isabel C. Allen, and are remaindermen. The case is in this court upon the appeal of the infant defendants.

The court made a finding of facts, which, in so far as necessary for a determination of this case, is as follows:

"And the court doth further find that said trustees undertook the trust aforesaid and are now acting as such trustees under the provisions of said will; that a large part of the real estate so devised is situated on Third and Fourth streets in said city and otherwise near to the site, hereinafter described, for the location of a hotel, and that much of said real estate is situated on Fourth street in said city immediately opposite to said site.

"That for some time prior to the month of February, 1892, the value of said real estate last above refer-

red to had depreciated, and the rents thereof had lessened and that a contingency thereby arose requiring said trustees, under the requirements of said will, to take some action to guard against such losses and shrinkage in values.

"That, for some time prior to said month of February, 1892, the general tendency of improvements in the city of St. Louis had been in a westward direction, away from the location of said real estate so held by the plaintiffs as trustees aforesaid, and away from the proposed site of said hotel, and that thereby and by reason of the facts last aforesaid a contingency had arisen requiring said trustees, the plaintiffs herein, under the requirements of said will, to take some action to guard against the losses and shrinkage in the value of said real estate, and the rents and profits to arise therefrom.

"That at or about the month of March, 1892, a certain corporation, known as the Commonwealth Realty Company, determined to erect a hotel in the city of St. Louis, to cost one million dollars, and to be in every way of first-class construction and appointment; that it was believed by owners of real estate lying in different portions of said city that the location of such a hotel near to their property would largely enhance its value and availability, and for that reason such owners offered to pay the Commonwealth Realty Company certain large sums of money, providing it, the said company, would locate its said hotel in near proximity to their property; that, among the localities under consideration by said company for the purpose of constructing its hotel as aforesaid, and to secure the selection of which the neighboring owners of property were offering contributions, was that known as the Planters House site, situated on Fourth street, between Pine and Chestnut streets, in said city.

"That at or about March 10, 1892, property owners who had interested themselves in, and offered contributions to secure, the location of said hotel on said Planters House site, refused to proceed further by way of competing with property owners in different localities, which were being considered by said Commonwealth Realty Company and which were competing for said hotel, unless the plaintiffs herein as trustees as aforesaid would make a contribution commensurate and proportionate to the real estate so held by them as aforesaid and located near to said proposed site.

"That at that time the said trustee, plaintiffs herein, had reason to believe and did believe, that the location of said hotel on said Planters House site would be largely beneficial to their said trust estate and would stay the shrinkage in the value thereof and in the rentals therefrom, and would have a great tendency to increase the values of said real estate, as well as the rentals thereof; that, acting on such belief and also believing at the time that some action on their part was then absolutely necessary in order to secure the location of said hotel on said Planters House site, two of these plaintiffs executed a paper in words and figures as follows:

"'St. Louis, March 10, 1892.

"'The undersigned, having read the subscription papers signed by the Laclede Building Company and others, the general purport of which is to contribute a bonus for the construction of a hotel, provided the same is located on the Planters House site, hereby undertakes and agrees as follows:

"'To subscribe, and he does hereby subscribe, the sum of ($5,600) five thousand, six hundred dollars, on the conditions specified in said paper.

"'The undersigned does also undertake, as one of the trustees under the will of Gerard B. Allen, to forth-

with institute a suit in conjunction with his co-trustees, to secure a construction of the said will, and a direction that out of a certain "reserve fund" therein provided, the said trustees proceed to make the subscription and to pay the sum contemplated in the paper so signed by the Laclede Building Company and others. And the undersigned agrees to proceed with all reasonable dispatch to secure the service upon the necessary parties, and to get the decree above specified at the earliest possible day. And the undersigned believes and has been so advised, that the court will give the direction to make the subscription and to pay out the money by the trustees. In witness whereof, I hereunto set my hand, at St. Louis, Missouri, this tenth day of March, 1892.

(Signed)           " 'GEO. L. ALLEN.

" 'The undersigned, Samuel N. Holliday, being one of the trustees under the will of the late Gerard B. Allen, agrees to so much of the foregoing as relates to the action of the trustees under said will, and also believes, after a careful consideration of the matter, that the court will make a decree directing the subscription of said bonus and payment thereof.

(Signed)           " 'SAM'L N. HOLLIDAY,

" 'Trustee under the will of Gerard B. Allen.

" 'In the event the said trustees be authorized to make, and do make the subscription above contem plated, the above subscription by Geo. L. Allen is to be inoperative.

(Signed)           " 'GEO. L. ALLEN.'

"That the paper therein referred to, as signed by the Laclede Building Company and others, is in the words and figures as follows:

" 'Subscription to the Commonwealth Realty Company as a bonus or donation towards the building of hotel.

" 'Know all men by these presents.

" 'Whereas, The Commonwealth Realty Company, a corporation created and existing under the laws of the state of Missouri, is about to erect a building adapted and to be used as a first-class hotel in the city of St. Louis, and

" 'Whereas, the undersigned subscribers hereto and hereafter designated as the parties of the first part, corporations, property owners, merchants and citizens of and in the city of St. Louis, being desirous of securing site, to wit:   A parcel of land situated in block number 101, of the city of St. Louis, fronting two hundred and thirty feet, four and one half inches on the west side of Fourth street, by a depth of one hundred, twenty-five feet, bounded north by Pine street, east by Fourth street, south by Chestnut street and west by private alley.

" 'Now, therefore, this agreement made and entered into by and between the undersigned subscribers hereto, as parties of the first part, and said Commonwealth Realty Company as party of the second part,

" 'Witnesseth:   That in consideration of the sum of five dollars unto each of said subscribers, parties of the first part, as aforesaid, paid by said party of the second part, receipt whereof they do each hereby acknowledge, and in consideration of the benefits, advantages and profits accruing to said parties of the first part, and each of them, in event of the location and erection upon the property aforesaid of said hotel building, and in further consideration of the mutual promises of the subscribers hereto, said parties of the first part by these presents covenant and agree with said party of the second part and with each other as follows, to wit:

" 'Section 1.     That they will each respectively pay unto said Commonwealth Realty Company, as contributions and donations to aid in the erection of said hotel building, the several sums subscribed for below and set opposite their respective names, said amounts to be payable in twenty equal installments of five per cent. each of said subscriptions, to be represented by twenty promissory notes of said subscribers, each for one-twentieth of their several subscriptions, payable to said Commonwealth Realty Company, bearing date July 1, 1892, and maturing in one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, nineteen and twenty months after date.     Said notes to be executed by the respective subscribers hereto and delivered into the custody of a trust company or bank of said city of St. Louis, designated by a majority in amount of the subscribers hereto, as soon as the site aforesaid is finally chosen for said hotel building, in trust, to be collected for said Commonwealth Realty Company as hereinafter provided.     If no trust company or bank be selected by a majority in number of said subscribers within thirty days from the final selection of said site as location of said hotel, then said Commonwealth Realty Company may nominate a bank or trust company of said city as depository of said notes, where same shall be payable.

" 'Section 2.     Said subscriptions are made subject to the following conditions, to wit:

" '*First.*     That said site shall be chosen as the location of said hotel building, and in event that said Commonwealth Realty Company shall select another and different site therefor, all liability on the part of said parties of the first part and the said party of the second part towards each other respectively shall cease and determine.

" '*Second*. That after the selection of said site for said hotel building and construction of a modern substantial first-class hotel building thereon of not less than ten stories in height, and at a cost of not less than one million dollars, shall proceed with all reasonable dispatch, in good faith, to be completed within two years from the beginning of the building.

" '*Third*. Each subscriber hereto shall only be liable for the amount of his own subscription and for no more.

" '*Fourth*. After said site shall have been finally selected and said subscription notes delivered unto the the trust company or bank selected in manner aforesaid, said trust company or bank shall proceed to collect said notes as they mature and shall disburse and pay over unto said Commonwealth Realty Company the proceeds thereof, in installments as follows: As the work on said building progresses, as rapidly as fifty thousand dollars shall be expended toward the construction thereof (and of which expenditure the certificate of the supervising architect shall be conclusive evidence) for each installment of fifty thousand dollars so expended in said building, said company shall be entitled to receive and said trust company or bank shall pay over to it, five per cent. of the total amount subscribed by the undersigned until the full subscription has been received and paid over.

" '.If said building be not commenced within six months from the selection of the site or if by the first day of the year 1894, the sum of five hundred thousand dollars has not been expended towards the construc tion of said hotel, then said trust company or bank, custodian of said notes and of the proceeds of same, shall return the same or such portion thereof as has not become payable to said Commonwealth Realty Company under the provisions hereof, unto the subscribers,

parties of the first part, each receiving his or its own subscription or such portion remaining thereof not payable to said Commonwealth Realty Company.

"' In witness whereof, said parties of the first part have hereunto set their hands and seals in the city of St. Louis, state of Missouri, this —— day of ——, 1892.'

"That said two trustees, George L. Allen and Samuel N. Holliday, induced the said Commonwealth Realty Company to accept the said paper as and in lieu of an absolute contribution; that on the strength of said paper other owners of real estate located in the neighborhood of said site, joined in the offer so made by said Laclede Building Company and others, and as a result thereof the requisite amount of contributions were secured and the said hotel was located on said Planters House site.

"And the court doth further find that said trustee George S. Drake, upon being informed of the facts aforesaid, approved the action of his co-trustees in signing said paper.

"And the court doth further find from the evidence that the signing of said paper and the engagement to pay the contribution aforesaid to said Commonwealth Realty Company was a necessity in order to secure the location of said hotel on said Planters House site as aforesaid, and that the location of said hotel on said site was largely beneficial to the estate so in the hands of said trustees as aforesaid, and that the location thereof on said site had a direct tendency and effect in the way of stopping the shrinkage in value of real estate in the neighborhood of said site, belonging to said trustees as aforesaid, and in guarding against losses by shrinkage in the rentals and income arising from said real estate.

"And the court doth further find that a contingency arose within the meaning of said will, requiring said plaintiffs, as trustees as aforesaid, in the proper management of the real estate in their hands as trustees, to make the contribution aforesaid for the purposes aforesaid.

"And the court doth further find from the evidence that the subscription aforesaid can be paid out of the reserve fund provided for in said will, without in any manner disabling said trustees from conforming to any other provisions of said will, with respect to said reserve fund.

"And the court doth further find that the amount of money required to pay the contribution according to the true intent and meaning of said papers is $22,400."

It may be conceded that a court of equity has no power to make a new will for a testator, and that the extent of its power is to construe the will as presented to it. And, further, that such court can no more authorize an act to be done which is in excess of the powers conferred by the will than can the trustees therein do such act. As to these propositions there is, or can be, no question or doubt.

The questions to be determined in this case are as to the duties and powers of the *trustees* as expressed by the testator in the will with respect thereto, to be gathered from the whole instrument, and not alone from some particular word, expression or clause of the will; and, in passing upon these questions the condition of the property disposed of by the will, and surrounding circumstances, as well also as the scope and context of the will in all its provisions may be taken into consideration. *Noe v. Kern*, 93 Mo. 367; *Long v. Timms*, 107 Mo. 512; *Schorr v. Carter*, 120 Mo. 413.

The will provides that the reserve fund shall be

retained by the trustees in the will to guard against loss by shrinkage or other contingencies, and that they shall invest and reinvest the same from time to time until the termination of the trust.

Technical words when used in a will are to be interpreted in their established legal sense, and as the testator is presumed to employ them, unless a contrary meaning is plainly intended by the context of the will. *Kean's Lessee v. Hoffecker*, 2 Harrington (Del.), 103; *Sims v. Conger*, 39 Miss. 231.

Invest has been judicially defined as follows: "To surround with or place in, as property in business;" "To place so that it will be safe and yield a profit." "It is commonly understood as giving money for some other property." *Neel v. Beach*, 92 Pa. St. 226. Investment, "in its most comprehensive sense, * * * is generally understood to signify the laying out of money in such manner that it may produce a revenue, whether the particular method be a loan or the purchase of stocks, securities or other property. In common parlance, it means putting out money on interest, either by way of loan or the purchase of income-producing property." *Una v. Dodd*, 39 N. J. Eq. 173; *People v. Insurance Co.*, 15 Johns. 392.

To give the words "invest" and "investment" their legal meaning as thus defined, in which the testator must be presumed to have employed them, the trustees had no power under the will to donate to, or subscribe to, the hotel fund any amount of money to be paid from the reserve fund of the estate, unless a contrary intention is clearly indicated by its context, when construed in the light of, and in connection with, the situation and condition of the property, of the testator and circumstances surrounding him at the time of its execution.

At that time that portion of the city near the site

of the old Planters Hotel, in which the testator owned large real estate properties, was being deserted by business, rents shrinking, and property rapidly depreciating in value. By his will he directed that out of the rents, issues and profits derived from his real estate, there be paid annuities to the amount of $9,000, and made provision for his children, Mary F., George L. and Grace during their natural lives, and also made provision for advances from time to time to the descendants of said children; and for that purpose he purposed creating a trust fund which would in all probability continue for sixty or seventy years. He did not want that part of his property situated east of Twelfth street, north of Walnut street, and south of Ashley street, sold or mortgaged, but wanted it kept until the expiration of the trust, then to vest in the descendants of his children. His purpose was to secure income from rents, and to that end, by the seventh clause of the will, he empowered the trustees:

"1. To enter into the possession thereof, immediately after my death, collect the rents, with full power, subject to the limitation hereinafter imposed, to sell, lease, manage and dispose of the same, and to invest and reinvest the proceeds of the sale thereof, and to do all and singular with respect to said real estate and the management thereof, and the investing and reinvesting the proceeds of sales thereof, as I might lawfully do if living.

"2. My said trustees shall have no power to sell the real estate to me belonging, which is situated within the limits bounded by Walnut street on the south, Ashley street on the north, as far west as Ashley street extends, and then Biddle street on the north, Twelfth street on the west, and the Mississippi river on the east. All the real estate in the second item of the

seventh clause of my will being in the city of St. Louis and state of Missouri.

"3. All my real estate, wherever situated, and not herein disposed of otherwise, except mentioned in the last preceding item (item 2 of seventh clause) I give my said trustees full power to sell, lease, incumber or improve."

It will be observed that the first clause of the will just quoted is very broad with respect to the general powers conferred upon the trustees, in that they are vested with power to sell, lease, manage and dispose of the real estate, and to do all and singular with respect thereto and the management thereof, and investing and reinvesting the proceeds of the sales as the testator might do if living. It would have been difficult to have employed language conferring larger and more general powers, upon the trustees, and, where their powers are intended to be restricted, it is done in apt and no un-meaning terms. To guard against loss by shrinkage the trust fund was created, not, it seems, alone from shrinkage by decay, and the ravages of time, but to pre-vent from depreciation from any other cause that might be in the power and foresight of the trustees in the exercise of that degree of care, skill and diligence that reasonably prudent persons similarly situated give to their own affairs, and such as the testator would, in all probability, have exercised, had he been living. The property on Fourth street was rapidly depreciating in value, rents falling off, business going west, which the trustees could stay, if not in fact restore this property to its former prosperous and more desirable condition if they had the power under the will to do so.

The "reserve fund" was to be created from the net rents, issues and profits arising from the trust estate which remained after payment of taxes, insur-ance, for repairs and improvements, and the life annui-

ties before mentioned, and to this end it.was necessary that the rental property be kept in condition, and its surroundings such that it would be in demand, and readily rented at fair prices. Had the trustees the power under the will to prevent the decrease in values, and increase the revenues that would be derived from the rents of the property to be affected by the hotel enterprise, by subscribing to, and paying out of the reserve fund to,. the Commonwealth Realty Company $100 per front foot? The questions are not of expediency, but of power.

We quite agree with counsel for defendants, and. as abundantly shown by the authorities cited by them. in their brief, that, where, by the provisions of a will, trustees therein named are empowered to invest and. reinvest the funds of the estate, a duty is imposed upon them to so place the money that it shall be safe and. productive. *Gray v. Fox*, 1 Saxt. Ch. 259; and the investment of trust property should be made with a. view of permanency, and not in a spirit of speculation. *Trust Co. v. Eaton*, 140 Mass. 532; *Emery v. Bachelder*, 78 Me. 233; *Peckham v. Newton*, 15 R. I. 321;. *Kimball v. Reding*, 31 N. H. 352; *Dickinson's Appeal*,. 152 Mass. 184; 1 Perry on Trusts [4 Ed.], secs. 245,. 456, 459.

While the subscription to the Commonwealth Realty Company for the purpose of building the hotel. was in a sense an investment, the estate, by reason. thereof, acquired no interest in the hotel property.. But, in consideration of the location of the hotel on. the site of the old Planters Hotel, the benefits and advantages which would accrue to the trust property by reason thereof, plaintiffs, as trustees, proposed to subscribe, to be paid out of said trust fund, the sum of $22,400.

The increase in business, rents, and values of the

trust property near the hotel which has already been constructed, as shown by the evidence, has greatly redounded to the interest of the estate, and evinces the foresight, good judgment, and management of the trustees in their desire to contribute to the fund for the erection of the hotel. The result of the investment has been a direct benefit to the estate by way of increasing the value of its property and the increase in rents, and, as shown by some of the witnesses, the best that could possibly have been made, but for which the hotel would have gone to some other point, and the trust property would have derived no benefit therefrom.

By item 2 of the seventh clause of the will it is provided that the trustees shall have no power to sell the real estate therein described, while by item 1 of the same clause they are given "full power to enter into the possession thereof, with full power to sell, lease, manage and dispose of the same, and to invest and reinvest the proceeds of the sale thereof and do all and singular with respect to said real estate and the management thereof" as the testator might do if living; so that it seems clear that item 1 has no application to the property mentioned in item 2, which can not be sold at all, while, as to the property referred to in item 1, large discretionary power is conferred upon the trustees as to the property to which that item has reference.

While the duty of the trustees to collect and disburse the income to the life tenants is no greater than their duty to preserve the *corpus*, including the reserve fund, for the remaindermen, yet the will provides that that fund shall be retained by the trustees to guard against losses by shrinkage or other contingencies, and that they shall invest and reinvest the same from time to time, until the termination of the trust, and out of said reserve fund to make certain advances, and, if there be any of it remaining after equalizing the advances made

therefrom, it is to be equally divided among the three children named in the will. It thus appears that the trustees were vested with full power to use the whole amount of said fund, if necessary, to guard against losses by shrinkage and other contingencies, and in making the contemplated advances, in doing which it might be entirely consumed.

Our conclusion is that, by the provisions of the will, power was conferred upon the trustees therein named to make the subscription to the Commonwealth Realty Company, to be paid out of said reserve fund for the purpose of procuring the location and erection of the hotel on the site of the old Planters Hotel, and that the court below correctly so held; but it has been with much hesitancy that we have arrived at this conclusion.

It is claimed that the matter in issue here is *res adjudicata;* that the former bill filed by the same parties was for the same purpose that the bill in the case in hand is for, that is, to "construe the will of said Gerard B. Allen in regard to the powers of said trustees under said will, and among other things, in regard to their power over said twenty-five per cent. net rents, called the reserve fund in said will." Upon the other hand it is contended, *first*, that the decree rendered in that case does not relate to the first source of power claimed by plaintiffs under the will; *second*, that it does not deal with the power conferred "to retain the reserve fund to guard against losses by shrinkage or other contingencies." From an examination of the decree in that case we are satisfied that the contention of plaintiffs with respect thereto is correct, and that the matter in issue here is not by reason of the decree in the former case *res adjudicata.*

From what has been said, it follows that the judgment should be affirmed, and it is so ordered. All concur.