BY THE

ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

AT THE

OCTOBER TERM, 1916.

FRITZ ALBERS et al., Appellants, v. ACME PAV-
ING & CRUSHER CO., et al., Respondents.

Kansas City Court of Appeals, January 29, 1917.

1. **TAX BILLS: Suit in Equity to Cancel: Grading Boulevard: Au-
thorization by the City.** The grade of Swope Parkway Boulevard
in Kansas City had been fixed and established. The park board
passed a resolution that a certain part of said boulevard be
graded to its full width and to the established grade. The City
Council then passed an ordinance authorizing the work to be done
"according to plans and specifications" referred to as being then on
file when there were none. If said ordinance had been the only
legislative enactment of the city authorizing the work to be done,
there might be room for the claim that the council had author-
ized something to be done the nature and extent of which was
unknown as no specifications had been adopted. But, after the
park board had adopted plans and specifications, and after it had
prepared a form of contract, had advertised for bids and had let
the tentative contract, the city, by ordinance, authorized the grad-
ing to be done as resolved by the board and in accordance with
the plans and specifications on file, and also ratified the tentative
contract, which made the same final and binding under Sec. 31,
Art. 13 of the Charter. Hence there was legislative authorization
for the grading and for its being done according to specifications,
even if the first ordinance referring to plans and specifications was
passed when none were on file.

265

2. ——: ——: ——: ——: Committing City to Improvement. The passage of an ordinance by Kansas City authorizing the grading of a boulevard and referring to plans and specifications as being on file when there were none in existence, did not irrevocably commit the city to the improvement regardless of the cost since the whole matter was in the council's hands and could be determined when it came to consider whether it would finally authorize the work and ratify the contract made by the board.

3. ——: ——: ——: ——: Ordinance: Effect of. The passage of an ordinance by Kansas City authorizing the grading of a boulevard and referring to plans and specifications as being on file when there were none in existence was not an absolute nullity, but with the plat of the city engineer, was sufficient to afford a basis on which to institute proceedings in the circuit court to ascertain damages. Hence the said court was not without jurisdiction to entertain and carry on said proceeding.

4. ——: ——: ——: ——: Ordinance: Surplusage. Where the provisions in the charter of Kansas City, pointing out the steps necessary to be taken in grading a street, were not violated in grading a parkway, and the fact that no plans or specifications were adopted prior to the adoption of the first ordinance of the city council in relation to the work, referring to such plans and specificatins as on file is not shown to have resulted in any detriment or injustice to the city, the public, or the parties involved, the mere recitation of such first ordinance that the plans and specifications were on file may be treated as surplusage.

5. ——: ——: Roads and Highways: Establishment: Defects Cured by Deed from Owners. A right of way deed signed by a large number of landowners, conveying to a county the right of way necessary to make a particular boulevard 150 feet in width, as to all lands whose owners joined therein, cured all defects in a prior proceeding to establish the highway.

6. ——: ——: Dedication: Subsequent Acquisition of Title. If deeds were sufficient to vest title to a graveyard in a land company which had dedicated streets by platting an addition, such title, though acquired subsequent to the platting of the addition, would inure to the benefit of the public by reason of the dedication by plat.

7. ——: ——: ——: Dedication of Land: Intention: Vesting of Title. If landowners intended to and did consent to an appropriation of a strip of land for a boulevard, it was not necessary for the prescriptive term to elapse in order to vest title in the public.

8. ——: ——: ——: ——: ——: Work on Private Property: Evidence. In a suit to cancel tax bills on the ground that the boulevard improved was over private property, evidence *held* not to warrant cancellation and cause a company which graded

the boulevard to lose payment for work done in good faith, and with no notice that there could be even a claim that grading was not on public property.

9. ———: ———: ———: ———: ———. Where owners of land executed a right of way deed for a parkway to the county three days before they got title to the land, but more than ten years elapsed after they obtained title and neither they nor any other person holding the property at any time made any claim to the strip they sought to dedicate by joining in the right of way deed which was open to and used by the public, such conduct on their part evinced an intention to dedicate the land after they had title; and if the right of way deed was not a valid statutory dedication, it was good as a dedication at common law.

10. ———: ———: ———: ———: Corporations: Conveyance: Want of Seal. If a realty company a corporation has a seal and does not affix it to a deed relinquishing right of way for a boulevard, doubtless the failure to attach the seal makes the deed insufficient as a conveyance of the company's legal title. But since the dedication attempted by the company has been accepted by the public, it is valid as a common-law dedication if not good otherwise.

11. ———: ———: ———: Church Trustees: Authority: Presumption. Church trustees, in conveying land to a county for a parkway, are presumed to have acted by authority from the church for whose benefit and under whose direction they held the property, and such trustees can properly dedicate property to a public use not inconsistent with the trust as to consent to an easement on the east side of church property to create a beautiful boulevard in front of the church.

Appeal from Jackson Circuit Court.—*Hon. Joseph A. Guthrie*, Judge.

Affirmed.

*House, Manard & Johnson* for appellants.

*Griffin & Orr* for respondents.

TRIMBLE, J.—Swope Parkway, hereinafter referred to, is a boulevard in Kansas City, Missouri, 150 feet wide running from Forty-seventh street to the entrance of Swope Park. The proceedings by which said boulevard was established, or sought to be established, were taken in 1903. It was laid out in that

year and ever since has been open to and used by the public as a highway of that width leading to Swope Park. At that time, that portion of said boulevard running from the west line of the southeast quarter of section 27, township 49, range 33, southeastwardly and south to Swope Park entrance was not in the city limits. Afterward, and in 1909, the city limits were extended so as to take said portion, and the territory through which it ran, into said city. In 1911, the city established the grade of said boulevard and began proceedings to have the above-mentioned portion thereof brought to the established grade, the cost of such grading to be paid by special tax bills issued against the property fronting on both sides of said portion of said boulevard. These proceedings resulted in the acceptance of the Acme Paving and Crusher Company's bid for the doing of the work and a contract with said company therefor, and in the issuance of special tax bills to the amount of $60,755.63.

This action, brought June 28, 1913, is a suit in equity by certain owners of property, the tax bills on which amount in the aggregate to $6089.56, to cancel said tax bills. After a trial and full hearing, the chancellor dismissed plaintiff's bill, and they have appealed.

Respondents motion to affirm the judgment because the bill of exceptions is not properly signed is clearly without merit. The case was tried before Hon. Joseph A. Guthrie, at that time the regular judge of Division No. 1 of the Jackson Circuit Court. He resigned before the bill of exceptions was signed, and Judge Buckner was appointed by the Governor as his successor. The bill was signed by Judge Buckner as Judge of said court, and following his signature appears that of Guthrie as former judge before whom the case was tried. Judge Buckner also made the order under which the bill was filed. The signing of Judge Buckner properly authenticated the bill. [Sec. 2032, R. S. 1909.] The signature of the judge who tried the case performed no function except to

show Judge Buckner that the bill was correct. Judge Guthrie's signature could in no way invalidate the signing done by Judge Buckner. The case of Ranney v. Hammond Packing Co., 132 Mo. App. 324, is not applicable by reason of the fact that, in the case at bar, the bill was signed and ordered filed by the judge who alone had power so to do. There is no question as to the correctness of the bill which Judge Buckner signed, since it contains a stipulation, signed by all the counsel, that it is correct. Hence there is not in the point made by the motion as much as was involved in a similar motion made in Johnston v. Ragan, 265 Mo. 420.

The objection to the validity of the bills which we shall first consider is that the proceedings by which the work was authorized and the tax bills were issued, are defective so as to render the bills null and void. This objection has two features, one relating to the proceedings by the city to authorize the work and the other to the proceedings in the circuit court to ascertain the damages caused by the grading. However, they are so closely related that the full force of the objection is not seen or understood unless they are considered together. Before these two features are specified, it will be better to set forth the steps that were taken, as in this way the strength or weakness of the objection based on said two features will more clearly appear.

On June 12, 1911, the Board of Park Commissioners, by a resolution, fixed the grade of Swope Parkway and recommended to the Common Council the passage of an ordinance establishing said grade in accordance with the resolution. The council, by ordinance approved June 14, 1911, established said grade in accordance with the resolution and recommendation of said Park Board. On July 10, 1911, the said Park Board, pursuant to section 31, article 13, Kansas City charter, 1909, adopted a resolution numbered 10,367, that the above-mentioned portion of Swope Parkway (describing it), be graded to the full width

thereof and to the established grade of the same. "Said improvement to conform in all respects to plans and specifications for said work *to be hereafter adopted* and perfected by this Board." Said resolution further specified that payment of the cost be made in special tax bills assessed against each lot or tract of land, within certain limits therein specified, and changeable therewith, on both sides of said Parkway. Said resolution further recommended to the council to provide, by ordinance, for the doing of said work and that payment for the whole thereof be made by special tax bills and that said council, by ordinance, order said work to be done. Thereafter, by ordinance No. 9447 approved August 16, 1911, said council ratified the action of the Board of Park Commissioners, and ordered that said portion of Swope Parkway be graded to the full width thereof and to the established grade, specifying therein that "the work herein authorized shall be of the nature described and specified in, and shall be done *in accordance with plans and specifications adopted, perfected and approved by the Board of Park Commissioners, which said plans and specifications are now on file in the office of said Board*, said improvement is hereby provided for and authorized." Said ordinance further provided that the cost should be paid in special tax bills issued against the property chargeable therewith, and further ordered that proceedings be had to ascertain and determine the damages to private property on account of such grading. The ordinance then described the benefit district and the limits within which the property should be assessed to pay the remuneration or damages to be allowed. The city engineer prepared a plat containing a correct description of the several lots in the benefit limits, and furnished the same to the Mayor as required by section 3, article 7 of the charter. Proceedings were then instituted in the circuit court of Jackson county, Missouri, on October 28, 1911, to ascertain the benefits and damages, as required by article 7 of said charter. These proceedings resulted in a verdict,

returned January 30, 1912, finding that the actual damage to each piece of property did not exceed the peculiar benefits accruing thereto by reason of the proposed grading and, therefore, no damages were allowed to any piece. No motion of any nature questioning the validity of this verdict was filed by anyone. Nothing whatever was done in said cause until the May term, May 13, 1912, when the city filed a motion to confirm the verdict and to enter judgment in conformity therewith, which motion was sustained by the court, and judgment was entered approving and confirming the verdict.

In the meantime, that is to say, on February 5, 1912, after the verdict had been returned but before the judgment of confirmation was entered, the Board of Park Commissioners, by resolution No. 10808, adopted plans and specifications for the grading of said portion of Swope Parkway, and approved the form of contract for said work and directed that advertisement be made for bids thereon. This was done, and bids for doing the work in accordance with such plans and specifications were received, and on February 19, 1912, the bid of the Acme Paving & Crusher Company was accepted and a contract was awarded it for the doing of such work. On February 26, 1912, said Park Board, by resolution, approved the contract and bond for the work, and recommended to the common council an ordinance providing for and authorizing the work. On March 5, 1912, the common council passed said ordinance, being Ordinance No. 11705, directing that the aforesaid portion of Swope Parkway be graded to the full width thereof and to the established grade of the same, the work and improvement to be of the nature described and specified in, and to be done in accordance with, the plans and specifications adopted by the Park Board February 5, 1912, and on file in the office of said Board, and in accordance with the contract and specifications therefor between the Board of Park Commissioners and the Acme Paving and Crusher Company and its surety, entered into on Feb-

ruary 19, 1912. Said ordinance ratified and confirmed the contract and made it and the specifications a part of the ordinance, and directed that payment of the cost of all the work be made in special tax bills assessed upon each lot or parcel of ground, within certain specified limits, chargeable therewith, on both sides of the Parkway, all in accordance with section 3, article 8 of the charter. Thereupon the Acme Paving and Crusher Company began the work, and while engaged therein, a notice signed by three of the plaintiffs, was, on May 22, 1912, served upon it and the Park Board stating that in their opinion the tax bills to be issued would not be valid for the reason that the proceedings were not in accordance with the city charter. The grading was done in strict accord with the specifications and when it was finished, the Park Board accepted the work and declared the cost thereof to be $60,755.63 and, by resolution, certified to the Board of Public Works an apportionment of the cost of the work and the issuance of the special tax bills. On January 30, 1913, the Board of Public Works approved the acceptance of said work and passed a resolution requiring the city assessor to return an assessment list against the property affected by the work for the purpose of charging the same with the cost of said grading. This was done and on January 31, 1913, the Board of Public Works approved the apportionment and assessed the tax bills to the aggregate amount of $60,755.63, against the property affected, and ordered the apportionment and assessment to be certified to the city treasurer and the tax bills to be made, certified, registered and delivered to the parties in whose favor they were made out. Thereafter, and on the same day, the tax bills were issued to the Acme Paving and Crusher Company, and on February 1, 1913, were delivered to that company and the Fidelity Trust company which companies accepted and receipted for them.

Having set forth in general outline the steps taken, we can now state the two features of plaintiffs'

objection hereinabove mentioned. They are: 1. That no plans and specifications were adopted by the Park Board prior to the passage of Ordinance No. 9447. 2. That no judgment was rendered on the verdict assessing no damages, returned January 30, 1912, until the May term following, at which time, plaintiffs say, the court had no authority to render judgment therein and that any judgment then rendered was a nullity.

It seems to us that the first matter to be determined is, when does the city charter require the plans and specifications to be filed? The Supreme Court in Waddell Inv. Co. v. Hall, 255 Mo. 693, say that in grading matters "the specifications are to follow the passage of the ordinance and not precede it." The charter does not *expressly* specify any point in the proceedings at which they must be adopted. Section 31, article 13, charter 1909, page 429, says the Park Board shall have power to cause ny road, parkway or boulevard to be graded in such manner and at such times as the Board may determine, provided, that if said Board shall, by resolution, determine that any such work shall be done and be paid for by special tax bills, the Common Council shall have power by ordinance to ratify and confirm the action of such Board and authorize the work to be done, in which case, and when so ratified, the Board of Public Works shall apportion the cost. Said section also provides that the Park Board shall let the contract to the lowest and best bidder and the work shall be done under the supervision of the Park Board, but such contract, before it becomes effective shall be ratified and confirmed by an ordinance of the Common Council. Now, in this case, the grade of the boulevard had been fixed by the Park Board and established by the council. The Park Board then passed a resolution, No. 10,367, that a certain part of said boulevard be graded to its full width and to the established grade. The council then passed Ordinance No. 9447. It is true it refers to plans and specifications as being on file when there

were none. And if said ordinance was the only legislative enactment of the council authorizing the work to be done there might be room for the claim that the council had authorized something to be done the nature and extent of which was unknown as no specifications had been adopted. But Ordinance No. 9447 is not the only ordinance authorizing the work. On March 5, 1912, *after* the Park Board had adopted plans and specifications, and after it had prepared a form of contract, had advertised for bids and had let the tentative contract, the city council by Ordinance No. 11705 authorized the grading to be done as resolved by said Board and in accordance with the plans and specifications adopted by and on file with said Board, and also ratified the tentative contract entered into, which ratification, under section 31, article 13 of the charter, made the contract final and binding. So that there was legislative authorization for the grading and for its being done according to specifications, even if Ordinance No. 9447 was passed at a time when no specifications were in existence. But it is claimed that the proceeding in the circuit court to ascertain damages was instituted before the passage of Ordinance No. 11705 and was therefore premature and a nullity. To understand this feature of the case it should be stated that said section 31 of article 13 of the charter also provides (charter p. 431), that before any road, parkway or boulevard shall be graded, if the property owners to be disturbed or damaged have not waived compensation therefor, proceedings shall be had for the ascertainment of damages and benefits as provided by section 2 and following, of article 7 of the charter. By section 2 and following, of said article 7, it is provided that the ordinance which authorizes the grading shall prescribe and determine the limits within which private property is deemed benefited by the proposed grading. [Charter, p. 293.] (This was done in both ordinance 9447 and 11705 and the district was the same in each as were also the other terms.) Section 3 of said article 7 (charter, p. 293) requires

the city engineer within thirty days, to furnish the Mayor with a plat containing a correct description of the several lots or parcels of private property in the benefit limits prescribed, but says that a failure to furnish the plat within the specified time shall not invalidate the proceedings. (This was made out and filed with the Mayor after the passage of ordinance No. 9447.) Then follow sections in article 7 providng for the institution of proceedings in the circuit court to ascertain and determine damages, which proceedings are instituted by filing in said court a copy of the ordinance and plat. [Charter, p. 295.] Plaintiff's view is that, since there were no specifications in existence at the time ordinance No. 9447 was passed, and hence none were approved or in existence when the ordinance and plat were filed in the circuit court, therefore there was no authority for the proceeding.

But said section 31 of article 13 provides (charter, p. 430), in dealing with the ratification of the contract by the Common Council, that it shall be ratified, approved and confirmed "in the same manner as contracts for *work done under the supervision of the Board of Public Works* are required to be ratified, approved and confirmed." Now, the ninth paragraph of section 3, article 8 (charter, p. 313), in reference to the ratification of contracts for work done under the supervision of the Board of Public Works, says: "The ordinances ratifying, approving and confirming the contract . . . shall also provide for and authorize the improvement, and *shall state the nature of the improvement* and this *may* be done *by a reference to the plans and specifications* therefor, and such ordinance shall state how the cost thereof shall be paid." This is exactly what ordinance No. 11705 did. And this is the only place, so far as we have been able to find, where plans and specifications are *specifically* referred to in providing for any ordinance to be passed by the council ratifying the action of the Park Board. In paragraph 6 of section 3, article 8, which says it relates to the improvement of public highways

of every character (charter, p. 310), by the Board of
Public Works, it is provided that the Board shall
adopt plans and specifications for the proposed improve-
ment (charter, p. 312), and in paragraph 7 of said arti-
cle 8 (charter p. 313) it is provided that *after* the adop-
tion of plans and specifications, the Board shall adver-
tise for bids. Thus the time when plans and specifica-
tions are imperatively required seems to be before bids
are advertised for. The charter certainly does not
*expressly* say anything about specifications for the
grading, in providing either for the Park Board's first
resolution to do the work or for the council's legislative
authority therefor. Specifications are required before
the bids are advertised and then, of course, they are
necessary, and they must be in existence and adopted
and on file in order that a valid tentative contract can
be made, and before the council can make the contract
final and binding by its ratifying ordinance. So that
the passage of ordinance No. 9447, with no specifications
in existence, did not irrevocably commit the city to an
improvement regardless of the cost since the whole
matter was still in the council's hands and could be
determined when it came to consider whether it would
finally authorize the work and ratify the contract
made by the Park Board. The council knew the width
of the boulevard and the established grade thereof, and
by said ordinance No. 9447, it authorized the boulevard
to be graded to its full width and to the established
grade in accordance with the recommendation of the
Park Board. Said ordinance was not an absolute nul-
lity but, with the plat of the city engineer, was sufficient
to afford a basis on which to institute proceedings in
the circuit court to ascertain damages. Hence the said
court was not without jurisdiction to entertain and
carry on said proceeding.

In this inquiry as to damages, the jury did not
have to consider plans and specifications in order to
know what the damages would be. The grade was es-
tablished, the width of the boulevard was known, the
ordinance called for the grading thereof to its full

width and to the established grade. These matters, together with the engineer's plat of the property and the names of the owners, were all before the jury, and fully enabled it to say, after hearing the evidence, what the damages to the abutting property, by reason of the proposed improvement, would be.

In this connection it should be remarked that there is no evidence that plaintiff in case at bar filed any claim for damages in said proceeding. Section 10, article 7, of the charter provides that any person who fails to file a claim for damages shall be deemed to have waived the same. Nor have any of the plaintiffs asserted at any time that their property has been damaged by the grading.

The fact that the circuit court did not render judgment upon the verdict until the May term following has nothing to do with the validity of the bills. Section 13, article 7 (charter, p. 304), provides that should no claim for damages be filed at any time before the day set for hearing or *if the verdict shall declare that no damages will result* to private property from the proposed grading, the city may proceed to cause the grading to be done. The verdict being that there were no damages, the city was free to go ahead with the grading, and was not interested further in the proceedings to ascertain damages unless indeed the verdict should be set aside or annuled in some way. Nothing of this kind was done, and when the verdict was confirmed on May 13, 1912, the record recites that all persons and parties interested in said proceedings were present. No claim is made that the plaintiffs in the case at bar were not made parties to that proceeding and, as heretofore stated, nothing was ever done afterward by anyone in said proceeding except by the city to have the verdict confirmed.

In fine, the grading determined upon by the Park Board, and for the doing of which the tax bills were issued, received the legislative sanction of the council *after* plans and specifications were adopted, and said legislation also provided and directed that said work

thus specified, should be done as resolved by the Board and should be paid therefor in the manner determined upon. The proceeding which resulted in a verdict assessing no benefits and no damages has never been disturbed, and there is no showing that any of the parties seeking to cancel said tax bills ever sought to disturb said result, or were even in a position where they could claim to be interested in the result. The provisions in the charter pointing out the steps necessary to be taken were not violated, and the fact that no plans or specifications were adopted prior to the adoption of the *first* ordinance in relation to the work is not shown to to have resulted in any detriment or injustice to the city, the public or the parties hereto, convinces us that the mere recitation in ordinance No. 9447, that the plans and specifications were on file, may be treated as surplusage, and that payment for the work should not be defeated by the cancellation of the bills upon the grounds thus far considered.

Another ground upon which the bills are attacked is that the proceedings by which Swope Parkway was established were defective and insufficent to vest the public with an easement in the right-of-way, and therefore, although the grading was done within the limits of the boulevard's width of 150 feet, as marked out and actually opened on the ground, yet such right-of-way, or at least portions thereof, is or are private property.

As stated, the steps by which Swope Parkway was created, opened and laid out, were taken in 1903. In 1886, long prior to the establishment of Swope Parkway, and before the territory, through which the hereinabove mentioned portion of said boulevard now runs, was taken into the city, Jackson county established a road, 80 feet wide, known as Cleveland avenue, the center line of which so far as concerns this case, ran from the southwest corner of the northeast quarter of the southeast quarter of said section 27 south to and on the center line of the east half of section 34, township 49, range 33 and on the center line of the east half of section 3, township 48, range 33, to the terminus of

said avenue. The center line of that portion of Swope Parkway which was ordered graded runs from the west line of the southeast quarter of said section 27 in a general southeasterly direction through the west half of the southeast quarter of said section 27, and the west half of the northeast quarter of said section 34 and into the northwest quarter of the southeast quarter of said section 34, until it coincides with the east line of said last named quarter-quarter section at a point 650 feet south of the northeast corner of said last named quarter-quarter section, and then said center line runs due south on the center line of the southeast quarter of section 34 and on the center line of the northeast quarter of section 3, and on the center line of the southeast quarter of said section 3, to a point 146 feet north of the south line of the north half of the southeast quarter of said section 3, the terminus of said boulevard. A comparison of the center lines of the above-mentioned portions of Cleveland avenue and Swope Parkway will disclose that the center line of the latter runs into and coincides with the center line of the former at the point 650 feet south of the northeast corner of the northwest quarter of the southeast quarter of said section 34, and the two said center lines continue to coincide as they run on south to the terminus common to both highways. As Cleveland avenue was only 80 feet wide and Swope parkway 150 feet in width, the effect of the opening of the latter was to absorb an additional 35 foot strip of ground on each side of the limits of Cleveland avenue. Kansas City brought no proceeding to condemn or acquire a right-of-way for Swope Parkway, or for the portion thereof graded, and did nothing to acquire any jurisdiction thereover except to extend the city limits in 1909. Plaintiffs say that, in so doing, the city obtained jurisdiction over only such portions of said right-of-way as had become vested in the public. Their view is that the establishment of Swope Parkway rests on a judgment

of the county court of Jackson county, made April 15, 1903, and that the same is null and void because the record of that proceding fails to show certain jurisdictional facts, namely, that the petition was signed by at least 12 freeholders of the municipal township, three of whom shall be of the immediate neighborhood, etc., as required by section 9414, Revised Statutes, 1899, and fails to show that notices were put up as required by section 9415 of said statutes of 1899. The only record in relation to the above-mentioned portion of Swope Parkway offered in evidence, aside from one noting the filing of a petition for the said highway, is the final judgment entered by the county court. It recites that Thomas H. Swope and others file petition and the court grants same, and establishes said highway 150 feet in width, being 75 feet on each side of the center line hereinbefore mentioned (describing it) "conditioned, however, that said petitioners secure a right of way for said route without any cost to the county." The record of the county court further directs that the Board of Park Commissioners be notified and requests that the city engineer assist in laying out said boulevard. There was evidence by an abstracter, who had searched the records, to the effect that this was all the record entries relating to said proceeding in the county court. It may be conceded that said record does not disclose the facts necessary to confer jurisdiction on the county court to establish said highway. And if that were all there was to vest the easement of the highway in the public, and if such vesting was not effected by anything except said judgment, it could well be said that no such highway was established. But in October, 1903, there was filed in the office of the county clerk of Jackson county a right-of-way deed signed by a very large number of landowners conveying to Jackson county the right of way necessary to make said boulevard 150 feet in width. Said conveyance cures all defects in the proceeding to establish said highway, that is, as to all lands whose owners joined therein. There is no showing that any land then owned by any of the plain-

tiffs was taken without their consent, nor that the lands now owned by plaintiffs were derived by them from any one who did not consent, or who objected to such taking. In fact, it is not shown that anyone objected to such taking or has manifested in any way any objection to such taking. So far as the record shows, no person has ever asserted a claim of ownership over any portion of the land within the limits of said boulevard, nor do plaintiffs or anyone else make any such claim. The boulevard has been opened to the public and in use by it ever since 1903, and during all that time nothing has been done by anyone to manifest a claim of ownership over any portion of said right-of-way. Stated correctly, the real gist of plaintiff's contention is that as the judgment of the county court was not sufficient to foreclose the rights of the owners of land taken, only those owners' rights were foreclosed who joined in the right-of-way deed in a way sufficient to convey title, and that there are certain tracts of land within said boulevard limits whose owners either did not join in said right-of-way deed or who, if they did join, did not follow the formalities necessary to make a technical conveyance of the legal title or to constitute a dedication thereof; and, although none of the owners of these tracts have made, or now make, any claim to land within the boulevard limits, nevertheless, plaintiffs, in order to defeat the tax bills assessed against their own property as its proportion of the expense of improving said boulevard, will assert, for the owners of said tracts, the claim that said tracts are still private property.

These tracts will be considered in their order. They are: 1. A graveyard which, according to the map or blue print of the boulevard in the abstract, was located east of Cleveland avenue and in the northeast quarter of the northeast quarter of said section 3. This graveyard contains one-fourth of an acre, and seems to have been square in shape. If so, then it is 104.354 feet each way, and if, as plaintiffs claim, its western line coincided with the east line of Cleveland avenue,

then in establishing Swope Parkway, a strip, 35 feet
wide by 104,354 feet long, off the west side of the grave-
yard, was taken into said boulevard. The graveyard
was not established by a conveyance of any kind. Its
first appearance is merely by reference in a deed made
in 1853 by William Adair and wife to one Adams con-
veying the northeast fractional quarter of said section
3 "excepting out of the piece one-fourth of an acre to
include a graveyard now on said land." It does not seem
to have been described by metes and bounds definitely
located in any of the conveyances to Adams or to his suc-
cessors in title. There is evidence that it never was
fenced, though there is other evidence that at one time,
years ago, it was fenced but that the fence had disap-
peared. At length, Joseph O. Thompson became the
owner of said quarter section and on April 16, 1903, he
conveyed a part of it to Collier et al., excepting the tract
set aside for graveyard. Collier et al. signed the right-
of-way deed relinquishing a strip of their land 35 feet
wide on the east side of Cleveland avenue for the widen-
ing of Swope Parkway. In 1906 the Collier land was
deeded to the Montopia Land Company and in this deed
no mention is made of a graveyard but the deed recites
that it is "subject to the rights of the public in the
street and boulevard as now established."

The Montopia Land Company, in April, 1906, plat-
ted this land into "Mountain View Addition" and
dedicated all streets shown thereon to public use.
Swope Parkway, 150 feet wide, appears on this plat
as the western boundary of "Mountain View Addition."
On July 11, 1907, William Adair, who first excepted
the tract for a graveyard, conveyed to H. C. Adair
a tract described as "Beginning 1251.2 feet west and
664.8 feet south of the northeast corner of said section
3, township 47, range 33, thence south 104.35 feet,
thence east 104.35 feet, thence north 104.35 feet, thence
west 104.35 feet to the place of beginning, containing
one-fourth of an acre." By mesne conveyances this tract
was conveyed to Montopia Land Company by deed filed
June 19, 1913. On June 13, 1907, two days after the

above-mentioned conveyance from William Adair and wife to H. C. Adair, said William Adair and wife made a quit-claim deed to H. C. Adair to one-fourth of an acre in the northeast quarter of section 3 "heretofore reserved for a graveyard." On June 20, 1913 (eight days before the institution of this suit), H. C. Adair conveyed to Montopia Land Company "all that one-fourth acre of land once reserved for a private graveyard in the northeast fractional quarter of section 3, township 48, range 33, the same being the only land ever used or reserved for graveyard in said quarter section and it is hereby intended to grant and now is granted all land ever so reserved or used." If these deeds were sufficient to vest title to the graveyard in the Montopia Land Company, then such title, although acquired subsequent to the platting of Mountain View Addition, would inure to the benefit of the public by reason of such dedication by plat. [Kansas City Mill Co. v. Riley, 133 Mo. 574; Reid v. Board of Education, 73 Mo. 295; Longworth v. Sedevic, 165 Mo. 221.]

It is contended, however, that the deed of July 11, 1907, from William Adair did not convey any ground occupied by the boulevard, since, as shown by various deeds in evidence, the distance from the northeast corner of said section 3 to the west line of the east half of said quarter section (the latter being the center line of Swope Parkway and old Cleveland avenue), is 1326.7 feet, and the beginning point of the one-fourth acre described in said deed of July 11, is 1251.2 feet west of east line of said section 3, and, therefore, the west line of said one-fourth acre tract is 75.5 feet east of center line of said Swope Parkway. Said deed of July 11, therefore, does not affect any portion of the land inside the boundaries of said Parkway, and so plaintiffs say the title to a 35 foot strip the length of the graveyard was still left in William Adair on July 11. This is assuming, of course that the west line of the graveyard reserved and excepted by him in 1853 coincided with the east line of Cleveland avenue. But there was no definite location of the graveyard by

metes and bounds, and may not this deed from William Adair, describing one fourth of an acre by metes and bounds, be regarded as a declaration of the precise location of the ground he had heretofore reserved? Being the one who made the reservation he would be presumed to know its location better than any one else. If, however, the correct location of said one-fourth acre made the west line thereof coincide with the east line of Cleveland avenue, still may not said William Adair's act, in making said deed of July 11, be regarded as a recognition on his part that the boulevard extended to a distance of 75 feet east of the center line of said quarter section? If so, then may not his act be regarded as a voluntary dedication *in pais* of the portion occupied by said boulevard? [Meiners v. City of St. Louis, 130 Mo. 284.] And if William Adair intended to and did consent to such appropriation of that strip of the land, then it is not necessary for the prescriptive term to elapse in order to vest title in the public. [McGrath v. City of Nevada, 188 Mo. 102.] It is true, two days later he made another deed to H. C. Adair to the graveyard "heretofore reserved" and recited therein that "the grantee herein is to hold one-fourth acre for the purpose of a graveyard." But this deed may be interpreted as evincing an attempt on his part to place a limitation on the tract he had already conveyed to H. C. Adair, i. e., that the graveyard then remaining should be held as such. Certain it is that neither he nor H. C. Adair nor anyone of the family or claiming under them have ever evinced the slightest objection to the widening of Cleveland avenue into the Parkway Boulevard. The evidence shows that this graveyard was a family burying ground of the Adairs; that there were five and possibly six graves on the tract. One witness says five and another says six. Three of the graves were surrounded by a brick inclosure eight or ten feet square and four or five feet high and the first above-mentioned witness says there were two graves immediately south of the inclosure and that there might have been a third outside of the inclosure but, if so, it

also was immediately south thereof. Witness Tolliver, however, says there was the grave of a child named Moon in the northwest corner and further west than the brick inclosure. He testified that "as nearly as I can remember, it would be nearly in the street now." He said the Adair family, he judged, were buried forty feet from Cleveland avenue, it might not be that far, it might be farther, he couldn't say. If they were buried forty feet from Cleveland avenue, the east line of the Boulevard did not come to their graves since only thirty-five feet on the east of ,Cleveland avenue was taken at this point. In the deed from H. C. Adair to the Montopia Land Co. of June 20, 1913, it is recited that owing to changed conditions it has become impracticable to use the land for a graveyard "and the bodies thereon are now being removed and said lands abandoned" for the purpose for which it was originally reserved. And at the time of the trial, November, 1914, the evidence disclosed that all graves on said tract had been removed, the little brick inclosure removed and nothing left to mark the former location of the graves. The evidence is that the brick inclosure was taken down "within the last few months" just prior to the trial. The testimony of the witnesses as to the location of the graves shows that they were depending upon their recollection of what they had observed in former years as to the location of graves with reference to the boulevard. While certain of them say the boulevard encroached even on the graves in the brick inclosure, yet there is clear evidence that the brick inclosure was not taken away until after the grading of the boulevard was finished, and that the west line of said brick structure stood about twenty feet east of Swope Parkway. If this is true, then the other witnesses were mistaken in their remembrance of where the inclosure was located, and said boulevard did not extend that far. It is true two of the witnesses say the boulevard took in the grave of the Moon child, but one of these at first said, "it would be *nearly* in the street now" and although he after-

wards stated that he was "confident" it was in the street, yet he afterwards qualified this by saying "as I recollect it" and his testimony shows he had never measured the distance of this grave from old Cleveland avenue and was merely giving his idea of its location based on his recollection of what he had observed in former years. He said the graveyard was first put there over forty years ago. If Cleveland avenue was established in 1886, the graveyard was there before the avenue was and hence was not located with any reference to the avenue. The witness said the graveyard abutted Cleveland avenue, the east line of said avenue being the west line of said yard, but on cross-examination admitted that he didn't know just where the lines of the graveyard were as they were never run. The other witness, in answer to the question whether the graveyard lay up against the east line of Cleveland avenue, said "I suppose it did" and "to the best of my recollection it did." And in answer to the question as to her recollection of the location of the Moon child's grave whether it was now in the Parkway, she replied, "To the best of my recollection it would be." But when asked on cross-examination if she was certain about it, she replied, "No, sir, I couldn't swear that it is, but to the best of my knowledge it is." And when asked if she would undertake to say that the east line of Swope Parkway takes in any of the graveyard, she replied, "From the way I thought it used to lie I would think it did."

It is clear from the evidence in the record that all the graves had been there a long time and if the Parkway did not reach to or disturb the brick inclosure on the graveyard, there was nothing to indicate to the company doing the grading in 1912 that the graveyard was being encroached upon, and the deed from William Adair to H. C. Adair dated July 11, 1907 (on record since April, 1909), would lead one to believe that the west line of said graveyard was 75.5 feet east of the center line of the boulevard, and therefore not within its limits. Under all these circumstances, and

considering the fact that the boulevard had been laid out since 1909, that no objection had been made to its occupancy of the ground, and none has even yet been made by anyone claiming to own or have an interest in it, that no boundaries of the graveyard were definitely shown until the deed of July 11, 1907, seemed to locate it outside of the boulevard, we fail to perceive any grounds whereon a court of equity should base a cancellation of the tax bills and cause the grading company to lose payment for work done in good faith and with no notice that there could be even a claim that the grading was not on public property. At no time since the boulevard was opened in 1903 has anyone laid claim to any part of the right of way thereof or objected to its being occupied as a highway. None of plaintiffs can claim any interest therein, but, in order to defeat the tax bills, they assert it is privately owned by other parties whom they do not represent and for whom they are not authorized to speak.

2. The next two portions of said boulevard, said to be private property, have to do with what are termed the Nelson & Pitrat tracts. One Flacey owned a tract 493.30 feet north and south, the west line of which was the center line of the northeast quarter of said section 3, which as heretofore stated was the center line of Cleveland avenue. This ground lay immediately south of the Collier tract herein above referred to. On March 30, 1903, Flacey conveyed the north half of his land to Emory Nelson and the south half to Anna L. Pitrat. Nelson and Pitrat signed the right-of-way deed hereinabove referred to and described therein "a strip thirty-five feet wide across our entire frontage on Cleveland avenue" for the purpose of widening Cleveland avenue to 150 feet instead of eighty feet and for boulevard purposes. This deed was signed by them on March 27, 1903 (three days before they got title to the land), and plaintiffs therefore say such dedication is not valid because of the rule that no one but the holder of the title can dedicate. The right-of-way deed was filed in October, 1903.

This was long after Nelson and Pitrat got the title, and since the establishment of the entire length of Swope Parkway was not finally completed till in the fall of 1903, no doubt the right-of-way deed did not *take effect* until then. But plaintiffs say that because no covenants of warranty were contained in the right-of-way deed the doctrine of after acquired title will not operate to validate the attempted dedication. But more than ten years have elapsed between the date Nelson and Pitrat obtained title and the date this suit was brought. Neither Nelson nor Pitrat, nor any person owning this property, have at any time ever made any claim to the strip they sought to dedicate by joining in the right-of-way deed. During all this time it has been open to and used by the public. They do not join in this suit and, so far as known, to this day make no objection to the use of the ground as a public highway, and it was accepted by the public authorities and has been under their control and dominion ever since. Such conduct on the part of the owners of the ground clearly evinced an intention to dedicate it after they had the title, and if the right-of-way deed was not a valid statutory dedication, it was good as a dedication at common law. [Rose v. City of St. Charles, 49 Mo. 509; McGrath v. City of Nevada, 188 Mo. 102; Elliott on Roads and Streets, sec. 159; Jones on Easements, sec. 440; Kansas City Mill Co. v. Riley, 133 Mo. 574.]

3. The next tracts said to be private property consist of two lots which abutted Cleveland avenue on the east side thereof owned by the Swope Park Realty Company. This company joined in the right-of-way deed to relinquish thirty-five feet necessary to make the 150 foot boulevard. It is urged that because the corporate seal of the company was not affixed to the deed, the strip still remains private property. As the company had a seal and it was not affixed, doubtless the failure to attach the seal made the deed insufficient as a conveyance of the company's legal title. But the company has never complained and is not now

doing so.   The dedication attempted by the Company was accepted by the public and is valid as a common-law dedication if not good otherwise.   [State v. DeVall, 157 Mo. App. 587; 13 Cyc. 441.]   Such a deed is good in equity where the grantee is in possession and cannot be disturbed.   [Pullis v. Pullis Iron Co., 157 Mo. 565.]

4. The last tract said to be private property is a strip thirty-five feet wide off the east side of a tract 100 feet long north and south by 190 feet wide east and west, lying in the northeast corner of the northwest quarter of the southeast quarter of said section 3, which said thirty-five foot strip was necessary to be added to the west side of Cleveland avenue at that point to make the 150 feet of said boulevard.   David C. Mastin owned all of said above named quarter-section, and in 1889 he deeded the above-mentioned 100 by 190 foot tract to certain trustees, and their successors in office, for a church lot.   The deed was not filed for record until September 10, 1897, meantime the said quarter-quarter section was deeded, without any reservation or exception of said church lot, to Thomas H. Mastin by deed filed January 15, 1891, and later another deed was made to him, still with no reservation, which was filed November 29, 1893.   On July 14, 1909, the widow and all of the heirs of Thomas H. Mastin conveyed to said trustees for the church the aforesaid tract of 100 by 190 feet "subject to the right of the public to use the east seventy-five (75) feet of the property hereinbefore described as a portion of Swope Parkway."   The trustees of said church joined in said right-of-way deed hereinbefore mentioned, but it is contended that as said trustees did not have an unlimited estate in fee their relinquishment of the thirty-five foot strip for the boulevard was invalid. The contention being that inasmuch as the church lot might revert, if devoted to other than church purposes, the trustees had only a determinable fee.   There was no reverter mentioned in the deed.   It may be

observed that if such reverter were possible, the owners of the reversion have, in their deed of July 14, 1909, recognized and consented to the rights of the public in said thirty-five foot strip, and the trustees in accepting said deed, and also by joining in said right-of-way deed, have consented, as far as lies in their power, to the dedication of said strip to the boulevard. It is not shown that the trustees acted without authority from the church for whose benefit and under whose direction they held the property. They are presumed to have acted by authority. The act of the trustees in consenting to an easement of thirty-five feet on the east side in order to create a beautiful boulevard in front of the church, is not disposing of the property in a manner inconsistent with the purposes of the trust. Trustees can properly dedicate property to a public use not inconsistent with the trust. [39 Cyc. 327; Prudden v. Lindsley, 29 N. J. Eq. 617.] No complaint of the trustees' action has ever been made by the church, nor has it at any time raised any objection to such dedication or to the boulevard. The lapse of ten years would bar the church from reclaiming it. [Hoke v. Central Farmers Club, 194 Mo. 576.] The facts certainly do not justify a court of equity in declaring that this strip is private property and upon that view decree the cancellation of the tax bills in controversy at the behest of parties who have no claim nor interest in said tract, and when no one interested therein has raised any objection to the dedication of said strip to public use and there is not the remotest likelihood of their doing so even if it were possible for such objection to succeed.

The judgment of the chancellor dismissing the bill is affirmed. *Ellison, P. J.,* concurs, *Bland, J.,* not sitting.