## Girard Estate

Before Klein, P. J., Bolger, Hunter, Lefever, Saylor and Shoyer, JJ.

*Joseph P. Gaffney,* for petitioner.

*Murray H. Shusterman,* for City of Philadelphia.

*Thomas I. Guerin* and *Fred DiBona,* for purchasers.

BOLGER, J., April 5, 1954.—On December 1, 1953, the board of directors of city trusts charged with the administration of the estate of Stephen Girard, deceased, a charitable trust, presented a petition for authority under the provisions of section 2 (*b-f*) of the Revised Price Act of June 7, 1917, P. L. 388, 20 PS §1564, and section 963 of the Fidu-

ciaries Act of April 18, 1949, P. L. 512, 20 PS §§320-963, to deed to the City of Philadelphia by base or conditional fee, subject to reversion to the board, 3⅔ acres of ground bounded by Twenty-first, Twenty-second, Porter and Shunk Streets in the forty-eighth ward of the City of Philadelphia, upon which is located the summer residence and some outbuildings of Stephen Girard, the tract now being known as "Girard Park". The residence is a well preserved, excellent specimen of Georgian architecture. This acreage is located in the southwest section of a large tract owned by Girard upon which the board of city trusts constructed 481 houses between the years 1906 and 1916, at a cost of $2,110,556.08. When these houses were erected, the project was regarded as a model development, not only as a wise business investment, but also as a great credit to Stephen Girard and to Philadelphia. It was unique in its conception and became a choice and distinctive residential section—in fact, it elevated the tone of all of that section of the city. The inclusion of the square undoubtedly redounded to the continued prestige and desirability of the houses for rental purposes throughout the ownership and operation of the trust. "Girard Park" was at that time reserved for the benefit of the tenants as well as for the public. In addition to the buildings, the park is adorned with 200 trees, shrubbery and several flower beds.

On November 24, 1950, upon application of the board of city trusts, this court approved the sale of these 481 houses (73 D. & C. 42). The houses were sold in slightly over one year and yielded a consideration of $5,188,050, subject to mortgages amounting as of this date to $2,055,186.07. On July 26, 1950, the board of city trusts formally resolved to dedicate the tract of ground in question to the city upon the same terms as are set forth in the present petition. Thereupon, Bernard Samuel, Mayor of Philadelphia, presented

to city council on December 13, 1951, a message proposing that the city accept the tender. However, due to an impending change in administration, the measure never came before city council for consideration. On September 18, 1953, the board of directors of city trusts again resolved to deed the tract to the City of Philadelphia as originally planned. The city accepted the offer by ordinance of city council approved by the Mayor on November 24, 1953. Thereupon, this petition was filed.

The authority requested is to "execute and deliver to the City of Philadelphia a deed and other instrument of dedication for all that tract or block of ground . . . the said City of Philadelphia to have and to hold the said tract or block of ground and the buildings and improvements thereon, as and for an open public place and park for the health and enjoyment of the people of Philadelphia, and for no other use or purpose whatsoever and upon the conditions, inter alia, that the City of Philadelphia at its own cost and expense shall at all times hereafter forever, maintain, care for, safeguard and preserve the said tract or block of ground, and all the buildings and improvements thereon, as an open public place or park for the health and enjoyment of all the people of the City of Philadelphia, to be known and designated as 'Girard Park', without power in the City of Philadelphia to alienate or encumber and with reversion to the City of Philadelphia, Trustee under the Will of Stephen Girard, Deceased, or its successors, if at any time the City of Philadelphia, voluntarily or involuntarily, shall cease to use the said property as above mentioned."

Consideration of the petition was referred by the court to Bolger, J. Thereupon, the latter held conferences with counsel for the board of city trusts, a representative of the city solicitor's office and Councilman Guerin, as a result of which a hearing upon the

petition was fixed for March 10, 1954, at 11 a.m. At this hearing there were present counsel for the board, the assistant city solicitor and counsel for purchasers as well as many individual purchasers. The history of "Girard Park" and of the purpose of the petition was explained and testimony presented in support of it.

The testimony reveals that the board of city trusts has been under the obligation of expending on an average more than $5,500 a year for the maintenance of the property and that the cost thereof is now about double that figure; that police conditions in the square are poor with practically little policing taking place since 1952; that the presence of the square in the neighborhood enabled the trustees to obtain higher rentals than ordinarily would have been yielded.

Many of the purchasers of the properties, especially those located contiguous to the park, testified that they paid on an average $1,000 higher for their houses than did the purchasers of the other houses with the express understanding with the officials of the board of city trusts that the park would be retained. These witnesses testified that should the park be sold, they would definitely sue the board of directors of city trusts either for recission of the sales or for damages. This testimony is accepted as valid since the present petition is clearly an effort by the board of city trusts to keep faith with the purchasers of the properties.

Robert W. Crawford, Deputy Commissioner of Recreation in the City of Philadelphia, testified that it is the city's purpose to incorporate this tract into the city's over-all program of recreation as a quiet place for small children and for rest and meditation for old and retired people under the classification of passive recreation as distinguished from active recreation, which includes playgrounds. Mr. Crawford stated that the area is in much need of such a facility; that it will cost the City of Philadelphia between $10,000 and

$15,000 per year to maintain it and it was estimated that capital and other expenditures will increase this amount substantially, including the pruning of the 200 beautiful trees. Mr. Crawford stated that no commercial concessions will be permitted.

Mrs. George Hammer, president of Girard Estate Community Club, a voluntary unincorporated association, which presently leases the homestead at a $1 month-to-month lease, testified that the club includes 182 families living in the vicinity and has been in existence for 15 years, during which the club has carried all house interior maintenance cost including painting, papering, cleaning and insurance. The board has taken care of carpenter work, plumbing and roofing. All 25 directors of the club meet monthly and supervise regular monthly recreational programs, including travelogues, flower marts, Christmas and Easter exercises and occasional concerts by the Police and Firemen's Band. The Club also participates in Red Cross, March of Dimes and other money-raising campaigns. The facilities of the property are open to all Philadelphians. Mrs. Hammer also testified to the necessity for police protection to prevent vandalism and theft.

Subsequent to the hearing, Mr. Gaffney, counsel for the board of directors of city trusts, supplied the court with a written appraisal by Walter H. Phillips, a disinterested appraiser, who fixed the present market value of the property at $80,000. The city has assessed it for the purpose of taxation (although it is exempt from tax) at $70,000.

The court cannot disregard the bona fides of the members of the board in attempting to carry out the assurances given the purchasers of the properties that the square would be maintained in perpetuity. Negotiations in transactions such as this with the City of Philadelphia cannot be completed as expeditiously as

with individuals. The city must act through its executive, legal and legislative authorities, all of whom have to scrutinize the transaction carefully to deliberate and to determine what advantage as well as responsibility the people of Philadelphia derive from it. The delay is, therefore, not attributable to petitioners. While in a large sense this application is being made nunc pro tunc, it could not have been made previously because of the inaction of the municipal authorities; therefore, it must be considered in the light of the circumstances existing when the court was requested to approve the sale of the houses in 1950, at which time the board passed its resolution of dedication. Therefore, many of the record facts and conclusions of this court forming the basis of our decision authorizing the sale of the houses (Girard Estate, 73 D. & C. 42) are relevant here. The principal ones were that the sales were for adequate considerations and that unless they were sold, the purposes of the trust, i. e., the education of the boys at Girard College, would be seriously impeded. In substantiation of these conclusions, we find in the complete sales report of the board of city trusts filed on February 9, 1953, that the income from the investment of the proceeds of the sales is approximately $186,000 per year as against a record of little or no profit from rentals for several preceding years. It is also interesting to observe in the report a statement that among the purchasers were 252 previous tenants. From this glowing picture, it is practically compelling to find that since the sales were predicated upon the retention of the square, the assurance of retention was of substantial consideration and benefit to the trust. .

Enumerating, the court finds as facts the following:

1. That the present value of the tract is $80,000 (in the absence of litigation to rescind sales).

2. That among the valuable considerations enuring to the trust are the following:

(a) The protection of the present investment of the trust in the $2,055,186.07 mortgages remaining on the houses sold.

(b) The greatly enhanced annual income ($186,-000) from the reinvestment of the proceeds of the sales.

(c) The additional $70,000 plus yielded by the sales of the houses contiguous to the square and the unestimated additional values yielded from the sales of the remaining properties in the tract, all of which exceed the present value of the tract.

(d) The elimination of the possibility of suits by these purchasers to rescind their contracts of sale or for damages based upon the assurances at the time of sale that the park would be retained.

(e) The elimination of the cost of maintenance of the park at a rate of $10,000 plus per year as well as of possible tort liability.

(f) The preservation and maintenance of the house, outbuildings and grounds by the City of Philadelphia as a permanent historical memorial to Stephen Girard and its use as a public place of recreation for the public of the city, who are among the expressed beneficiaries under the will of Stephen Girard.

(g) The reversion reserved in the deed.

The court, therefore, finds as the basic fact that the board of directors of city trusts has and will receive adequate consideration in return for the dedication of this property and that the transaction is and will be of definite benefit to the trust.

The reversionary interest not only protects the trust but also enures to the interests of the purchasers of the property in that it serves as a check upon the city's responsibility. If conditions arise, not now possible to envisage, which require proceedings to be taken to exercise the reverter, the record in this case will serve as evidence for all concerned. Appended to the record

is a letter from the Deputy Commissioner of Recreation of the City of Philadelphia stating that it is the city's intention to retain the designation of the tract as "Girard Park" and to permit the Girard Estate Community Club to continue its community activities on the premises so long as they conform to the public interest.

We must not, therefore, regard the petition in the light of the stern obligation of trustees of charitable trusts to refrain from giving away trust property and from placing the res beyond their control, but to preserve and to make trust property productive and not to delegate to others the administration of the trust. The gravamen is whether the proposed transaction is of sufficient benefit and advantage to the trust.

Where an estate is conveyed in fee for a specified purpose "and no other", the fee is a base fee determinable upon the cessation of the use of the property for that purpose: Calhoun et al. v. Hays et al., 155 Pa. Superior Ct. 519 (1944).

As stated in Black's Law Dictionary, a base fee is "A determinable or qualified fee; an estate having the nature of a fee, but not a fee simple absolute". And a qualified fee is defined as "A fee having a qualification subjoined thereto, and which must be determined whenever the qualification annexed to it is at an end; otherwise termed a 'base fee' ": 2 Bl. Comm. 109; 1 Steph. Comm. 225; Loechel v. Columbia Borough School District 369 Pa. 132, 85 A. 2d 81 (1952).

It is also true, where a dedication is for a limited or restricted use, any diversion therefrom to some purpose other than the one designated is likewise forbidden: Bruker v. Carlisle Borough, 376 Pa. 330, 102 A. 2d 418 (1954).

In the instant proposed dedication the estate is conveyed for a specified purpose, "and no other": Slegel v. Lauer et al., 148 Pa. 236, 244. The fee is

determinable upon the cessation of the use of the property "as an open public place and park for the health and enjoyment of all of the people of the City of Philadelphia, and for no other", or "upon failure of the City at its own cost and expense to at all times hereafter forever maintain, care for, safeguard and preserve the said tract of ground, and all the buildings and improvements thereon".

The following authorities support the actions of the trustees in dedicating property in fee simple under appropriate circumstances. A fortiori, a conveyance by base or conditional fee should, therefore, be approved in proper cases.

In Scott on Trusts, vol. 2, §190.10, pp. 1036, 1037, it is stated:

"Ordinarily it is, of course, improper for the trustee to make a gift of trust property. A gift has been permitted where, although the trustee receives nothing directly in exchange, the gift is advantageous to the trust estate. Thus in Drake v. Crane 127 Mo. 85, 29 S. W. 990, 27 L. R. A. 653 (1894) the court permitted the trustee of a tract of land to make a donation from trust funds to a hotel company to secure the location of the hotel near the land, since this would result in enhancing the value of the land. So also it has been held proper for the trustee to dedicate a part of the trust property for highway purposes, if this would be advantageous to the trust estate. Such dedication is, of course, proper where the trust is a charitable trust and it is within the purposes of the trust to dedicate part of the property for streets or other public purposes. Even in the case of a private trust, the trustee has power to dedicate a part of the property for streets or parks or other public purposes, if this makes the remaining property more valuable. If consideration is received for the dedication, it is, of course, proper to make such dedication."

In King v. Inhabitants of Leake, 5 B & Ad. 469, 110 Eng. Rep. 863 (1833), cited in footnote 3 to the above text, an English case, the question raised was whether it was competent for the person in whom the soil was vested to dedicate the use of part of it, to the public, as a highway. Parke, J., said:

"If the land were vested by the Act of Parliament in commissioners, so that they were thereby bound to use it for some special purpose, incompatible with its public use as a highway, I should have thought that such Trustees would have been incapable in point of law, to make a dedication of it; but if such use by the public be not incompatible with the objects prescribed by the Act, then I think it clear that the Commissioners have that power. The mere circumstance of their not being beneficial owners cannot preclude them from giving the public this right."

In Albers et al. v. Acme Paving & Crusher Co., 196 Mo. App. 265, 194 S. W. 61 (1917), cited in the same footnote, it was held that trustees, such as church trustees, can properly dedicate property to a public use not inconsistent with the trust, as to consent to an easement on the east side of church property to create a beautiful boulevard in front of the church; such action is not disposing of property in a manner inconsistent with the purposes of the trust.

In Bogert, Trusts and Trustees, vol. 3, par. 1, sec. 551, pp. 403, 410, under the title Express and Implied Powers, it is said:

"A great variety of implied powers are to be found in trusts which have occasioned litigation. . . . It has been held that a trustee may dedicate lands to a public use consistent with the trust." (Citing Prudden v. Lindsley 29 N. J. Eq. 615; U. S. v. Benedict 280 Fed. 76; Magic v. Basquin 60 Ohio Abs. 377, 102 N. E. 2d 42 (1951).)

In Prudden v. Lindsley, supra, cited by Bogert, it was held, trustees, if vested with the title to lands, may dedicate them to a public use which is consistent with the trust.

Also citing Albers v. Acme Paving & Crusher Co., supra, and Prudden v. Lindsley, supra, upon the subject of gift or dedication, it is said, 65 C. J. 702, §568:

" A trustee has no power to make a gift of trust property, or to diminish the trust fund by voting a gratuity out of it; but he may properly dedicate the property to a public use not inconsistent with the trust."

The petition is granted.

### Decree

And now, April 5, 1954, the court being of the opinion that the proposed dedication would be for the benefit and advantage of the trust estate, without prejudice to any trust, charity or purpose for which real estate is held, without violation of any law which may confer an immunity or exemption from sale or alienation, and that the proposed dedication will preserve and save from impairment the primary and dominant purpose of the trust, to wit, the maintenance and development of Girard College, therefore decrees that:

The City of Philadelphia, trustee under the will of Stephen Girard, deceased, acting by the board of directors of city trusts, is authorized to execute and deliver to the City of Philadelphia a deed or other instrument of dedication for all that tract or block of ground with the buildings and improvements thereon, situate in the forty-eighth ward of the city, bounded by Twenty-first, Twenty-second, Porter and Shunk Streets, the City of Philadelphia to have and to hold the tract or block of ground and the buildings and improvements thereon, as and for an open public place and park for the health and enjoyment of the people of Philadelphia,

and for no other use or purpose whatsoever, and upon the conditions, inter alia, that the City of Philadelphia at its own cost and expense shall at all times hereafter forever maintain, care for, safeguard and preserve the tract or block of ground, and all the buildings and improvements thereon, as an open public place and park for the health and enjoyment of all the people of the City of Philadelphia, to be known and designated as Girard Park, without power in the City of Philadelphia to alienate or encumber and with reversion to the City of Philadelphia, trustee under the will of Stephen Girard, deceased, or its successors, if at any time the City of Philadelphia, voluntarily or involuntarily shall cease to use the property as above mentioned.